Louis Lesser and Jeanne Lesser v. Commissioner.
Lesser v. Commissioner
Docket No. 63975.
United States Tax Court
T.C. Memo 1960-111; 1960 Tax Ct. Memo LEXIS 176; 19 T.C.M. (CCH) 592; T.C.M. (RIA) 60111; May 31, 1960
*176 Respondent disallowed a partnership loss in the sum of $107,000 and increased the income of petitioner-partner in said amount. The partnership loss was based upon petitioner's purported transfer of his house to the partnership at a valuation of $200,000 and its alleged sale by the partnership back to petitioner for $93,000. Held, respondent correctly disallowed the loss to the partnership but such disallowance would only result in an increase of petitioner's income to the extent of 10.3 plus per cent of said sum, which was his per cent of profits and loss established by the partnership instrument. George T. Altman, Esq., 233 South Beverly Drive, Beverly Hills, Calif., for the petitioners. Richard W. Janes, Esq. and Leo K. O'Brien, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioners' income tax and addition to tax as follows: Addition to Tax
Sec. 294(d)(2)
Year Ended
Deficiency
IRC of 1939
Nov. 30, 1951
$76,293.98
$4,216.47
Only the fiscal year ended November 30, 1951 is before this Court. The principal question for decision is whether respondent properly disallowed a loss of $107,000 to Torrance *177 Gardens partnership and properly included said amount in petitioners' income for the year in question. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Petitioners Louis Lesser (hereinafter sometimes called Louis) and Jeanne (or Jean) Lesser, his wife, reside in Beverly Hills, California. Petitioners filed a joint income tax return with the then collector of internal revenue for the sixth district of California for their fiscal year December 1, 1950 to November 30, 1951. An amended return for said fiscal year was filed on March 17, 1952. Since Jeanne Lesser is a petitioner here only by virtue of having filed a joint return with Louis, the latter will sometimes be referred to as petitioner. In 1949 petitioner built a mansion-type home in the city of Los Angeles and after furnishing it and living in it for a few months he listed it for sale for a price of $200,000, which price included the furniture. He was unsuccessful in his efforts to sell the house and furnishings. Petitioner entered into negotiations with Charles D. Wagner, the controlling stockholder of Carlton Manor Apartments, Inc., with a view to trading his house at a price of $200,000 *178 for some acreage options owned by said corporation. Petitioner was unsuccessful in making the trade, but he was anxious to secure the acreage (97.7 acres in Torrance, California) for the purpose of building and sale of houses thereon. He was unable to finance the purchase of the acreage alone. On March 10, 1950 petitioner formed a partnership with Albert A. Feldman, Louis M. Feldman, Arthur Gilbert and Ben Feldman for the purpose of securing all of the stock of Carlton Manor Apartments, Inc., and thereby its asset consisting of the acreage options. The capital contributions and shares in profit and loss (Article V) as they appear in the partnership agreement, are as follows: Share of
Capital
Capital
Profit and Loss
Name
Contribution
Account
%
House with
Lesser, Louis and Jean *
furnishings
$200,000
71.57894730
Feldman, Albert A. and Marjory *
$ 50,000
50,000
7.89473686
Feldman, Louis M. and Blanche *
30,000
30,000
4.73684212
Gilbert, Arthur and Rosalinde *
50,000
50,000
7.89473686
Feldman, Ben
50,000
50,000
7.89473686
Total (cash)
$180,000
$380,000
100%
In *179 order to secure the services of a builder the partners anticipated that it would be necessary to share profits and loss with a builder. They orally agreed Louis was to find the builder and the builder's share was to be taken out of Louis's share of profit and loss (71.5 plus per cent). The said partnership agreement also provided, in part, as follows: "WHEREAS, CARLTON MANOR APARTMENTS, INC., a corporation * * * has certain assets and properties including, but not limited to, options to purchase certain acreage, situate in the City of Torrance, * * * California, * * * and "WHEREAS, there are issued and outstanding four hundred seventy-five (475) shares of the capital stock of said Apartment Co.; and "WHEREAS, the parties hereto are desirous of associating themselves into a copartnership for the purchase of all said shares of said Apartment Co., its dissolution and the acquiring thereby of said options, and, by the exercise thereof, acquiring and developing said land * * *. * * *
"(e) Lesser shall contribute to capital the following described property: * * * together with the improvements, furniture and furnishings thereon, which is hereby agreed to be accepted by the remaining copartners *180 so as to constitute a contribution to the capital hereof of Two Hundred Thousand Dollars ($200,000.00). Said real property and said improvements, furniture and furnishings thereon have heretofore been appraised; by reason of said appraisal the value of said real property has been set at One Hundred Twenty-Five Thousand Dollars ($125,000.00), and the value of said improvements, furniture and furnishings thereon, has been set at Seventy-Five Thousand Dollars ($75,000.00). * * *
"IX.1 In the event of the termination or expiration of this copartnership, the liabilities of this copartnership shall be paid or adequately provided for, and the remaining assets shall be distributed among the copartners hereof in the proportion that each shall be entitled to share in the profits and losses hereof. * * *
"IX.4 There shall first be distributed from and by the copartnership, after paying or providing for the payment of all liabilities owing to creditors other than copartners, the entire of the capital contributions of Albert, Louis, Gilbert and Ben, and a total and aggregate of One Hundred Twenty-Five Thousand Dollars ($125,000.00) of the capital contributed by Lesser. From any remaining properties *181 and assets there shall be next paid and distributed unto Lesser the sum of Seventy-Five Thousand Dollars ($75,000.00) in the aggregate. Thereafter, all properties and assets of the copartnership, which will represent the net profits of the copartnership, shall be paid and distributed to and among all the copartners as is set forth in Article V hereof." On May 4, 1950 the partnership, by its partners, entered into agreements with Wagner and three others, the owners of all of the stock of the Carlton Manor Apartments, Inc. By these agreements the partnership purchased all the outstanding stock of said corporation for $97,619.49, payable $27,619.49 in cash before May 10, 1950, and the balance of $70,000 on or before November 10, 1950. On or shortly after May 4, 1950, Arthur Gilbert withdrew from the partnership because he did not believe that the house was worth the $200,000 value placed on Louis's share by the partners' agreement. On May 15, 1950 a second partnership agreement was entered into. This agreement dissolved the first partnership and reestablished it unchanged except for the recitation that Gilbert had transferred his interest to the Manalis Furniture Company, a partnership. *182 The sole effect of this agreement was to substitute the Manalis partnership for Gilbert's interest in capital contribution and share of profit and loss. On June 12, 1950, a California corporation, Torrance Gardens, Inc., was formed. No shares of stock were issued by said corporation. The corporation was used by the partnership to deal with the Veterans Administration, to procure loan commitments to facilitate the purchase of the houses to be built on the acreage, to negotiate for interim financing and other similar purposes. It filed three income tax returns for the period between June 12, 1950 and May 31, 1952, inclusive. [1] The only entries on the returns are notations to the effect that the corporation was inactive and had no income or expense. No assets are listed on the returns. Louis signed one return as president of the corporation and W. Malat signed all of them as either vice president or assistant secretary, or both. On June 15, 1950, Louis drew a deed which showed the transfer of his house to Torrance Gardens, Inc. On September 20, 1950, there was executed *183 a memorandum agreement signed by Louis Lesser, his father Ben Lesser, his brother-in-law William Malat, and his two sisters, Claire Lomas and Shirley Rudman. This agreement provided for the sale by Louis and the purchase by each of his said relatives of 20 per cent interest in Louis's "right, title and interest in and to said copartnership [Torrance Gardens]. " It further provided each relative would pay for said interest by each giving Louis a one-year promissory note in the sum of $40,000 bearing interest at 5 per cent per year. The notes delivered were worth their face value at the time Louis received them and they were all paid. On September 22, 1950 a third set of partnership articles was drawn for the Torrance Gardens partnership. This agreement was signed by Louis's relatives and all of the former partners. It dissolved the second partnership and it was substantially the same as the two prior agreements except for a change as to Louis's share in profit and loss and his share of distribution on liquidation. It also provided for the inclusion of Jerome, Cecil and John Moss as partners to the extent of a 20 per cent share in profits and losses but with no capital interest. The *184 Mosses were builders who agreed to undertake the construction of houses on the acreage. Their 20 per cent interest was taken from Louis's original 71.5 plus per cent interest in profits and losses. The new agreement also re-included Arthur Gilbert since Gilbert had purchased Ben Feldman's interest for $50,000. In all other pertinent respects the articles of copartnership were similar to those establishing the first and second partnerships. The shares of the partners in capital, profits and losses as they appear in the agreement of September 22, 1950, are shown in the following schedule: Share
Share in
in Profits
Capital on
or Losses
Name
Liquidation
%
Lesser, Louis
$ 40,000
10.31578946
Feldman, Albert
50,000
7.89473686
Feldman, Louis
30,000
4.73684212
Gilbert, Arthur
50,000
7.89473686
Manalis (partnership)
50,000
7.89473686
Lesser, Ben
40,000
10.31578946
Malat, William
40,000
10.31578946
Rudman, Shirley
40,000
10.31578946
Lomas, Claire
40,000
10.31578946
Moss, Jerome
0
6.66666666
Moss, Cecil
0
6.66666667
Moss, Joel
0
6.66666667
TOTAL
$380,000
100%
The clause providing for distribution on liquidation merely gave Louis's relatives an equal share with him, without changing the method or amount of total distribution or the distribution *185 to the other partners. At some point in the early stages of the formation of the first partnership, before Gilbert withdrew, the partners agreed that if the partnership should subsequently request it, Louis would pay into the partnership $93,000 cash and get his house back. After deeding the house to Torrance Gardens, Inc., Louis and his family continued to live in the house. No rent was paid for such use of it and a broker was given an exclusive listing for the sale of the house. It was advertised for sale in newspapers and on occasion shown to prospective buyers. In the event of a sale, it was agreed by the partners that the partnership was to receive the first $93,000 of the purchase price, the broker was to receive any amounts between $93,000 and $113,000 and the partnership all amounts above $113,000. No buyers were found for the house and on November 10, 1950 the $70,000 balance was due to the former holders of the Carlton Manor Apartments, Inc. stock. At about this time the partnership requested Louis to take the house back. On November 16, 1950 a written agreement was entered into between Louis and the partnership. By the terms of this agreement Louis was to purchase the house *186 from the partnership at a price of $93,000. Of this sum Louis paid $70,000 cash as of the date of the agreement and was to pay the balance of $23,000 within a year. He subsequently paid $23,000 to the partnership on August 2, 1951. On February 9, 1951, a deed was drawn which shows the transfer of the house from Torrance Gardens, Inc., to Louis. The broker received no commission for this transfer. After the transfer Louis continued his efforts to sell the house. Nonexclusive listings of the property were given to real estate brokers and the house continued to be shown to prospective purchasers. Finally a buyer was found. The house was sold by Louis for $126,500 to a buyer provided by another real estate agent. It was transferred to the buyer by deed dated March 17, 1951 and escrow was closed on May 28, 1951. The partnership brought the development of the acreage to a financially successful conclusion. Partnership returns of income were filed for the periods May 15, 1950 to September 21, 1950 (second partnership); September 22, 1950 to August 31, 1951 (third partnership); and a final return for the period from September 1, 1951 to December 31, 1951 (third partnership). On his income *187 tax return for the fiscal year ended November 30, 1950, Louis treated the contribution of the house to the partnership as a taxable event and reported for capital gain treatment on said return the difference between his claimed cost basis of $154,110.78 in the house and the $200,000 value at which it was contributed. Petitioner's taxable year before this Court is the taxable year beginning December 1, 1950 and ending November 30, 1951. During that period the third partnership filed its partnership return for the period of its existence from September 22, 1950 to August 31, 1951. Prior to petitioner's taxable period here in question, the second partnership had filed its first and only return of income for the period from May 15, 1950 to September 21, 1950. On said return it was reported that there had been "NO OPERATIONS". The balance sheet of the second partnership included with said return showed among current assets Louis's house listed at a value of $200,000 and construction in progress including land at a value of $243,299.86. Its total assets were listed at $451,333.04. No distributions were shown to any partners and no profit or loss was shown. On the third partnership's return *188 for its only fiscal period falling within petitioner's fiscal year here in question, the profit and loss statement showed gross income from the sales of homes on the acreage of $3,899,520, less the cost of homes sold of $3,552,104.25, gross profit on the sale of homes of $337,415.75 and, after several small adjustments for other income items, a total gross income for the period of $105,337,999.80. The said schedule showed general operating expenses for the period of $105,124.91 and a loss on the transaction involving Louis's house of $107,000, which were combined to provide total expenses for the period of $212,124.91. After a small adjustment for contributions said schedule showed a net income figure of $126,124.89. This amount was divided among the partners' capital accounts in accordance with their shares in profit and loss at the end of the period under the third partnership agreement. At this time Louis's share of profit and loss was 10.31578946 per cent. On the basis of this figure, $13,010.78 was added to his capital account, the balance of which at the end of the partnership's fiscal period was $52,984.99. [2] *189 In his Federal income tax return for the fiscal year ended November 30, 1951 Louis included in his gross income $13,010.78 as his distributive share from the Torrance Gardens partnership. He also included in the schedule of capital gains and losses the sale of the house for $126,500 and listed it as purchased for $93,000, claiming this amount and $6,978.26 expenses of sale as his basis in it. The difference of $26,521.74 was treated as long-term capital gain. Respondent, in adjustments to net income in petitioner's notice of deficiency for the taxable year ended November 30, 1951, increased petitioner's ordinary income from the Torrance Gardens partnership by $107,000 and accompanied said increase with the following explanation: "(3) The amount of $13,010.78 returned to you as your distributable share of partnership income of Torrance Gardens has been increased to $120,010.78 by the addition of $107,000.00 representing an increase in your distributable share of partnership income. The loss of $107,000.00 claimed by the Torrance Gardens, a partnership, in its return for the fiscal year beginning September 22, 1950 ending August 31, 1951 from a purported *190 resale of your personal residence to you is disallowed as a deduction to the partnership. "The long-term capital gain of $13,260.87 (50 percent of $26,521.74) returned by you from the sale of your personal residence to the Torrance Gardens, a partnership, has been eliminated from your income." In respondent's notice of deficiency for petitioner's taxable year ended November 30, 1951, respondent increased income and reduced capital gain by certain amounts. In the explanation of adjustments the reasons for these changes were set forth, in part, as follows: "(1) The net profit of $1,420.87 returned by you as long-term capital gain from the sale of three lots, Pioneer Plaza #2, is net profit from the sale of three homes. The homes are part of a single subdivision tract financed and constructed by Pioneer Plaza #2, Inc. The net profit was received and retained by you under a claim of right and without restrictions as to its disposition. "It is held the sales were those of Pioneer Plaza #2, Inc., and the net profits are taxable first to it and then, as corporate distribution to you as a stockholder of Pioneer Plaza #2, Inc., as ordinary income under section 22(a) of the 1939 Internal Revenue Code. *191 "In the alternative it is held that the homes were not capital assets but were held primarily for sale to customers in the ordinary course of your trade or business. The net profit from the sale is taxable as ordinary income under the provisions of section 22(a) of the Internal Revenue Code of 1939. "The capital gain of $710.44 (50 percent of $1,420.87) has been eliminated from your income. "(2) The net profit of $13,454.61, less interest of Gershuny, Hoffman & Gillan of $8,902.88 or $4,551.73 returned by you as long-term capital gain from the sale of 20 homes, Teri-Plaza Tract 16250, has been decreased to a net profit of $9,681.26, less interest of Gershuny, Hoffman & Gillan of $8,902.88 or $778.38. The homes are part of a single subdivision tract financed and constructed by Teri-Plaza, Inc. The corrected net profit was received and retained by you under a claim of right and without restrictions as to its disposition. "It is held the sales were those of Teri-Plaza, Inc., and the net profits are taxable first to it and then, as corporate distribution to you as a stockholder of Teri-Plaza, Inc., as ordinary income under section 22(a) of the 1939 Internal Revenue Code. "In the alternative *192 it is held that the homes and the commercial lot were not capital assets but were held primarily for sale to customers in the ordinary course of your trade or business. The net profit from the sale is taxable as ordinary income under the provisions of section 22(a) of the Internal Revenue Code of 1939. "The capital gain of $2,275.87 (50 percent of $4,551.73) has been eliminated from your income." Opinion The first issue is whether respondent properly disallowed a loss of $107,000 to Torrance Gardens partnership and if he did, whether he properly included $107,000 in petitioner's taxable income for the taxable year in question. Petitioner contends that he transferred the house to the partnership for $200,000 capital interest therein and he subsequently repurchased it from the partnership for $93,000; that these transfers were bona fide, independent transactions; that the loss on the sale of the house by the partnership to him ($107,000) was a loss to the partnership and should be allowed in computing its net income; and that any attempt to tax petitioner on a greater amount than he reported as income from the partnership or any attempt to charge him with the receipt of income in the *193 sum of $107,000 is incorrect. Respondent states his theory of the case as follows: "it is simply that the Lesser residence was not contributed to the partnership; that the only capital contribution made by petitioners was $93,000. Since the house was never contributed to the partnership, its alleged resale to petitioners for $93,000 never took place. Since the house was never contributed to the partnership, its alleged resale by the partnership to the Lessers did not result in a $107,000 loss to the partnership. Since the partnership did not suffer a $107,000 loss, such deduction by the partnership should be disallowed; since, further, the partnership credited petitioners on its books with a $200,000 capital contribution (the alleged value of the house), only the petitioners - and no other members of the partnership - stood to gain by the series of paper transactions with respect to the house. * * * "The result of this disallowance was to increase the distributable shares available to the partners for that year; however, since only Louis Lesser received the benefit of this $107,000, his income was increased to that extent. That is the 'cash-flow' position of respondent." We thoroughly *194 agree with respondent's contention that petitioner's house was never transferred to the partnership as petitioner's $200,000 contribution to the partnership capital. In fact, it is clear it was never transferred to the partnership at all. It was transferred by petitioner's deed of March 1950 to a corporation, Torrance Gardens, Inc. This corporation appears in this record as a shadowy entity which never issued any stock or did any business. Even after the said purported transfer, it did not report any assets. After giving the deed, Louis and his family continued to live in the house without paying rent up until its sale by Louis in 1951. Petitioner urges that such facts as the recorded deeds of transfer, the payment of a sum to a broker as commission at the time of original transfer of the house, and that the partnership caused the house to be listed for sale, all prove the reality of the transfer. The partnership was not mentioned in the deeds. The Feldman partners were relatives of the broker and it fairly appears petitioner's payment to him was for his efforts in bringing the partners together. Even if we assume there was some sort of agreement on the part of petitioner to transfer *195 the house to the partnership, it is clear it was not to be received as a $200,000 capital interest. It is clear from petitioner's evidence, showing an oral agreement, that upon demand of the other partners, it was to be retransferred to petitioner for $93,000, the house was to be no more than some sort of pledge to secure petitioner's $93,000 contribution to the partnership capital. The fact that the partnership books showed the house as a partnership asset valued at $200,000 is immaterial. The fact remains the partnership never owned the house and all it received from petitioner by way of capital contributions from petitioner was $93,000. Respondent's disallowance of the $107,000 loss taken by the partnership was correct. We cannot agree, however, that the disallowance of the loss to the partnership warrants the inclusion of $107,000 in Louis's income for the period in question. The single year before the Court is petitioner's taxable year ended November 30, 1951. Section 188, International Revenue Code of 1939, provides as follows: "SEC. 188. DIFFERENT TAXABLE YEARS OF PARTBER AND PARTNERSHIP. "If the taxable year of a partner is different from that of the partnership, the inclusions *196 with respect to the net income of the partnership, in computing the net income of the partner for his taxable year, shall be based upon the net income of the partnership for any taxable year of the partnership (whether beginning on, before, or after January 1, 1939) ending within or with the taxable year of the partner." This is a case where the petitioner-partner has a different taxable year from that of the partnership. His taxable year ended November 30, 1951 and the partnership's taxable year ended August 31, 1951. The partnership, for the period ended August 31, 1951, reported net income of $126,124.89 after deducting the purported $107,000 loss on the so-called sale of Louis's house as an ordinary loss. But the disallowance of this loss as a partnership loss does not mean petitioner's income should be increased by that sum. It merely means the partnership income distributable to the partners would be increased to $233,124.89 ($126,124.89 plus $107,000). Petitioner's distributive share under the partnership agreement was 10.3 plus per cent of $233,124.89. This means he understated his taxable income from the partnership by 10.3 plus per cent of the $107,000, or approximately $11,021. *197 The partnership liquidated and filed its final report December 31, 1951. When it distributed its assets then on hand, petitioner and his four relatives received $107,000 more than the other partners with capital interests in the partnership and respondent uses this fact and an argument that petitioner's transfer of a four-fifths interest to his relatives was without substance to support his adjustment. Petitioner testified he had sold four-fifths of his capital interest in the partnership in September 1950 to his four relatives. Respondent argues no such sale occurred and points to petitioner's failure to include the gain from the sale in his 1950 income tax return. Petitioner admits it was error not to include such gain in his 1950 tax return. Respondent goes on to argue that petitioner's relatives never were partners and actually petitioner had approximately a 51.5 plus per cent capital interest in the partnership. The sale of four-fifths of Louis's interest is well established by the agreement with his relatives of September 20, 1950. The record is clear that each one of his relatives gave petitioner a note for $40,000 and the notes were paid. The fact of the sale is recognized *198 by the execution of the new partnership agreement (the one that is here involved) where they were added as partners and petitioner's distributable share was reduced from 51.5 plus per cent [3] *199 to one-fifth of said figure, or approximately 10.3 plus per cent. At any rate, petitioner's relatives were the named partners in the partnership agreement of interest here along with a furniture company, builders and other persons unrelated to petitioners. The instrument executed by all of the partners gave petitioner and each of his relatives a 10.3 plus per cent interest in the profits. The record does not warrant taxing any of the partnership income distributed or distributable on August 31, 1951 to petitioner's relatives to him. Moreover, any amount distributed or distributable by the partnership to the partners for any taxable period of the partnership not ending within petitioner's taxable year is of no consequence in this case. We hold, as stated earlier, that respondent's disallowance of the purported $107,000 partnership loss was correct but this disallowance means that no more than 10.3 plus per cent can be added to petitioner's income for his taxable year in question. At the trial of this case petitioner's counsel introduced evidence dealing with the issue discussed above concerning petitioner's house but no evidence with regard to the adjustment set forth in our findings of fact concerning the sales of houses in Pioneer Plaza #2 and Teri-Plaza, Inc. At the close of all of the testimony on the first issue petitioner's counsel stated with respect to the adjustment concerning the house sales in Pioneer Plaza #2 and Teri-Plaza, Inc.: "The Petitioners accept the alternative determination of the Commissioner in the deficiency notice, that the real estate properties involved were not capital assets but were held by them, the Petitioners, primarily for sale to customers in the ordinary course of their trade or business." Counsel for petitioner went on to state that with respect to the submission of this issue: "I am willing to leave the record in this manner." Petitioner's leaving the record "in this manner" means he offered no evidence upon the issue. Judgment for respondent will be entered *200 on this issue on the ground that petitioner failed to sustain his burden of proof. See William Malat, 34 T.C. - (May 31, 1960), this day decided. The additions to tax under section 294(d)(2), Internal Revenue Code of 1939, are allowed subject to the Rule 50 computation. We are told other adjustments were settled by stipulations and concessions. Decision will be entered under Rule 50. Footnotes
*. Husband and wife: The interest of each husband and wife was a community interest and will be hereafter described solely in the name of the respective husband.↩
1. Two of these tax returns covered the same period June 12, 1950 to May 31, 1951, one of them being marked "delinquent".↩
2. Louis's account was also charged with his share of partnership charitable contributions in amount of $25.79.
3. As pointed out in our findings of fact, by oral agreement amongst the original partners, Louis's original 71.5 plus per cent share was to be reduced by the builders' 20 per cent.